UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF COLUMBIA

AFFIDAVIT IN SUPPORT OF
AN ARREST WARRANT

I, Konstantinos S. Giannakoulias (hereinafter Affiant), Detective, District of Columbia Metropolitan Police Department (MPD), being duly sworn, state as follows:

1. I am a fifteen-year veteran of the Metropolitan Police Department (M.P.D.). I am currently assigned to the Superintendent of Detectives Division (S.D.D.) Violent Crime Branch (Homicide). I am also detailed to the Metropolitan Police Department's Cold Case Squad. Prior to my detail to the MPD Cold Case Squad, I was assigned to the FBI-MPD Safe Streets Gang Task Force. I have received formal training in Auto Theft, Criminal, Death, Gang, and Narcotics Investigations. I have also received formal training in Bloodstain Pattern Analysis. During the course of my career with M.P.D., I have participated in over 500 drug and/or firearms related arrests and have also applied for and/or executed over 500 search warrants which have led to the recovery of illegal narcotics, weapons and other evidence relating to violent criminals.

2. I was co-case agent investigating two consecutive long-term, gang-related enterprises which resulted in successful prosecutions of these organizations in the United States District Court for the District of Columbia. The first of these prosecutions, United States v. Tommy Edelin, et al., was the first death penalty prosecution in the District of Columbia in over 30 years. The second of these prosecutions, United States v. Kevin Gray, et al., involved a total of 23 defendants charged with various crimes such as violations of the Racketeering and Influenced and Corrupt Organizations

Page 1

(RICO) statute, racketeering conspiracy, maintaining a continuing criminal enterprise (CCE), and narcotics violations. The two investigations involved a total of forty-six (46) separate murders. Additionally, I have lectured at the FBI Academy in Quantico, Virginia, the Metropolitan Police Department (District of Columbia) and Fairfax County (Virginia) Police Academies on topics, such as gang-related investigations. Furthermore, I have lectured at the University of Virginia School of Law on the use of informants and cooperating witnesses. In November of 2000, I taught a course on "Task Force Operations" to the National Police in Kiev, Ukraine. In 1999, I lectured at the FBI National Academy, Quantico, Virginia, on investigative techniques and crime scene management to officers of the Greek National Police.

## STATEMENT OF FACTS

3. On June 22, 2001, at approximately 10:50 a.m., a body in an advanced state of decomposition was located in the woods across from 1508 Marblewood Avenue, Fairmont Heights, Maryland. The Prince George's County fire board responded to the scene and the victim was pronounced dead at 11:00 a.m. The victim was then transported to the office of the Chief Medical Examiner for the State of Maryland located at 111 Penn Street, Baltimore, Maryland. The victim was identified as RUBIN COY PRUITT, B/M, DOB:

4. On June 23, 2001, an Assistant Medical Examiner performed an autopsy on the body of Rubin C. Pruitt and determined that Rubin C. Pruitt died of a single gunshot to the back of the head. The manner of death was ruled homicide.

5. On April 21, 2005, your affiant interviewed Cooperating Witness 1 (hereinafter referred as CW-1) at the United States District Court for the District of Columbia. During the interview CW-1

advised your affiant that IT had been supplying the decedent (also known as Cory) heroin and crack cocaine which CW-1 had obtained from Gerald Eiland. In June 2001, CW-1 "fronted" (sold on consignment) the decedent two "dippers" of heroin. The decedent had been avoiding paying CW-1 the $2,000 he owed. CW-1 heard from others that the decedent had sold the heroin, but used the money to pay for his own expenses instead of paying CW-1 the amount he (decedent) owed him (CW-1), which he planned, in turn, to pay off Eiland for the heroin Eiland fronted CW-1. Not receiving payment from the decedent also deprived CW-1 from realizing any profit from the sale to the decedent. CW-1 then devised a plan to murder the decedent and obtain something of value from the decedent. CW-1 knew that the decedent had connections with another supplier of crack cocaine, and requested that the decedent set up a crack cocaine deal. CW-1 pretended that IT had a buyer interested in purchasing a large amount of crack cocaine and requested that the decedent obtain one-quarter kilogram of cocaine base (crack cocaine). CW-1 used this as a ploy to get the decedent to obtain something of value which CW-1 could take after IT murdered the decedent. This plan served several purposes of the criminal enterprise. It allowed CW-1 to recoup payment for drugs sold through the enterprise. It also enhanced the reputation of CW-1 and those with whom IT associated. Finally, it served as an example of the discipline meted out by members of the enterprise for transgressions against a member.

6. CW-1 thought the decedent was avoiding CW-1 because of the money he owed CW-1. However, CW-1 knew that the decedent would have contact with the defendant, Veldon Louis Lipscomb (hereinafter referred as defendant). The defendant learned of the robbery/murder plan from CW-1, and agreed to contact the decedent to facilitate the ruse whereby the defendant and CW-1

Page 3

would rob and kill the decedent. The decedent agreed to meet CW-1 sometime around June 18, 2001.

7. Shortly before the planned meeting, CW-1 was riding with the Gerald Eiland and the defendant. CW-1 explained to Eiland the plan to rob and kill the decedent. Eiland initially told CW-1 to forget about the decedent, asking CW-1 to promise not to do anything to the decedent. CW-1 told Eiland IT was not promising him anything. CW-1 further told Eiland IT could call off the hit if Eiland paid IT the $2,000 that the decedent owed CW-1. Eiland cursed and said he would not do that to call off the hit. CW-1 asked Eiland to drop IT and the defendant off near IT's car which IT intended to drive to the location IT had told the decedent to meet for the drug transaction, near the old Hecht's warehouse on New York Avenue, in Northeast, Washington, D.C. CW-1's initial plan was to meet in the car where IT would shoot the decedent, and leave him in the car.

8. The decedent contacted CW-1 and said he could not meet CW-1 at the arranged site. They instead agreed to meet at CW-1's house on _____. The decedent arrived at the location. CW-1, the Defendant, and the decedent all went to the basement of the house. The decedent pulled out the cocaine and placed it on a table. CW-1, who was standing slightly behind the decedent shot the decedent in the back of the head with a Model 17 Glock 9mm semi-automatic pistol causing blood to spatter and pool in different areas of the crime scene. CW-1 later took possession of the crack cocaine.

9. After the murder, CW-1 called Eiland and asked if he could help CW-1 clean up and dispose of the body. Eiland came to the house with carpet cleaner and all three, including the

defendant, cleaned up the carpet and loaded the wrapped-up body in the trunk of CW-1's Hyundai Excel. CW-1 and the defendant drove the body of the decedent to Prince George's County and dumped it in a wooded area. CW-1 and the defendant washed out the trunk of the car and CW-1 subsequently disposed of it. The decedent had arrived at the             house riding a motorcycle. After the three men cleaned the basement and loaded the body into the car, Eiland drove away the decedent's motorcycle and abandoned it in Southeast, Washington, D.C. CW-1 discarded the pistol by tossing it in the garbage. CW-1 gave the defendant drugs and money as payment for the defendant's role in the murder of the decedent.

10. On April 22, 2004, your affiant along with Detective Thomas R. Webb traveled to Prince George's County homicide office and located Rubin Coy Pruitt's (decedent) homicide case jacket. The information contained within the case jacket was reviewed and it corroborated CW-1's statement.

11. On May 13, 2005, your affiant showed CW-1 a confirmation photograph of the decedent, Rubin Coy Pruitt. CW-1 stated that the photograph was of the same person IT shot and killed.

12. On May 13, 2005, CW-1 was asked how long IT had known the defendant. CW-1 stated that IT had known the defendant all IT's life. CW-1 further stated that the defendant's true name was Veldon Lipscomb a/k/a Louie. Your affiant showed CW-1 a single color Metropolitan Police Department Live Scan photograph for the purpose of confirmation. CW-1 confirmed IT was the same person that assisted CW-1 in the murder of the decedent.

13. On June 22, 2005, your affiant showed CW-1 two confirmation photographs of                                                . CW-1 stated that was the house where CW-1 shot

the decedent.

14. On June 29, 2005, Detective Thomas R. Webb presented and was issued, a D.C. Superior Court search warrant for ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯, ⎯⎯⎯⎯⎯⎯⎯⎯, D.C.

15. On June 30, 2005, members of the FBI-MPD Safe Streets Task Force along with the Metropolitan Police Department's Mobile Crime Unit executed the D.C. Superior Court search warrant at ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯, ⎯⎯⎯⎯⎯⎯⎯, Washington, D.C. Detectives seized several photographs, a South Carolina tag, and mail matter related to the investigation. Mobile Crime Techinicians Greenwalt and Holder processed the crime scene and discovered blood spatter and other blood evidence in the basement of the house. Mobile Crime Technicians subjected the suspected blood evidence to a chemical test (phenothaline) which produced a positive color reaction (turned pink in color) for the presence hemoglobin. Technicians Greenwalt and Holder cut and seized several large wall wood paneling containing blood spatter, cut a large section of the carpet, and cut a section of the padding which contained blood.

16. On July 13, 2005, your affiant interviewed CW-1 at U.S. District Court for the District of Columbia. CW-1 provided your affiant with additional information where blood and firearm evidence could be located in the basement of the house.

17. On July 14, 2005, Detective Thomas R. Webb presented and was issued a second D.C. Superior Court search warrant for ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯, Washington, D.C. On July 14, 2005, members of the FBI-MPD Safe Streets Task Force along with the Metropolitan Police Department's Mobile Crime Unit executed the second D.C. Superior Court search warrant at

_____ ast, Washington, D.C. Mobile Crime Technicians seized a section of wood paneling with an apparent bullet hole, a section of red carpeting containing blood, and a section of carpet padding containing blood.

18. Your affiant respectfully requests that an arrest warrant be issued for VELDON LOUIS LIPSCOMB a/k/a LOUIE, B/M, DOB _____ and/or _____ , SSN: _____ 8, charging him with Murder in Aid of Racketeering, 18 U.S. Code, Section 1959 (a)(1) for the murder of the decedent, Rubin Coy Pruitt.

_____
DETECTIVE KONSTANTINOS S. GIANNAKOULIAS
METROPOLITAN POLICE DEPARTMENT
HOMICIDE - COLD CASE SQUAD

SWORN AND SUBSCRIBED THIS _____ DAY OF FEBRUARY, 2006.

FEB 2 8 2006

_____
U.S. MAGISTRATE JUDGE
ALAN KAY
U.S. MAGISTRATE JUDGE